**MANSFIELD HARDWOOD LUMBER COMPANY, Appellant,**

**v.**

**Hattie A. JOHNSON et al., Appellees.**

**No. 17299.**

United States Court of Appeals Fifth Circuit.

June 16, 1959.

**318**

Charles D. Egan, Benjamin C. King, Sidney M. Cook, Frank M. Cook, Shreveport, La., for appellant.

John M. Madison, Vernon W. Woods, Shreveport, La., Ned A. Stewart, Texarkana, Ark., J. W. Patton, Jr., Lewisville, Ark., for appellee.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

## PER CURIAM.

Interpreting the opinion as being based on a breach of fiduciary relationship owed by appellant's officers and directors and majority stockholders to the appellees as minority stockholders, appellant insists that such a decision must fail in law because: (1) the existence vel non of such a fiduciary relationship must be determined by the laws of the state of incorporation, viz., Delaware, which imposes no such fiduciary relationship; (2) the Civil Law of Louisiana prohibits the imposition of the remedy of "constructive trust" or "equitable lien" on real or personal property; and (3) Article 1847, LSA–Civil Code,[1] requires that there be an element of "intent" or "design" for an action to be based on fraud; and liability predicated on "constructive fraud" is unknown in Louisiana Civil Law.

Upon further consideration, we agree that the opinion is at least misleading, particularly to Louisiana jurists who practice under that State's unique concepts of equity jurisprudence. We will attempt to clarify and correct the basis for our holding.

We initially expressed doubt that the defendant's officers were guilty of fraud per se because of our doubt that the naked "intent to deceive" element was adequately established. We next held that a "growing minority" of jurisdictions, including Louisiana, recognize a fiduciary relationship or a position of confidence existing between the directors and officers of a corporation and the individual stockholders, especially when the former purchase shares of stock from the

---

1. Article 1847, LSA–Civil Code, reads in part:
   "Fraud, as applied to contracts, is the cause of an error bearing on a material part of the contract, created or continued by artifice, *with design* to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other. * * *" (Emphasis supplied.)

Article 1848, LSA–Civil Code, reads:
   "Fraud, like every other allegation, must be proved by him who alleges it, but it may be proved by simple presumptions or by legal presumptions, as well as by other evidence. The maxim that fraud is not to be presumed, means no more than that it is not to be imputed without legal evidence."

latter. And we held that, when this fiduciary duty is violated, it is

" * * * immaterial whether its breach is described as constructive fraud, unjust enrichment, fraudulent breach of trust, breach of fiduciary obligation, gross negligence, or otherwise, and whether the remedy is given by a constructive trust, restitution, or accounting. These are all relative terms describing broad equitable concepts. The standard of a fiduciary's duty to his beneficiary, depending upon the instant relation and the facts of the particular case, lies somewhere between simple negligence and willful misconduct or fraud with the intent to deceive. The actual intent to deceive is not required where one party is so placed in such an advantageous position to the other. Actual fraud will afford redress in the absence of the special relationship."

We concluded by holding that Louisiana has long recognized the fiduciary relationship in situations like the present case, and that these Louisiana decisions "fully answer appellant's contentions that Louisiana's limited equity jurisprudence will prevent our imposition of a 'constructive trust' or 'equitable lien' or 'right of restitution' for the breach of the fiduciary duty owed to the plaintiffs

by defendant's officers." Then, we listed the ways in which this confidential relationship was violated.

■ We believe that all of what was said above is good law, both in common-law States and in Louisiana, except for the possible misleading construction which could be placed on the statements which describe the breach of this duty and the remedy in broad equitable concepts as applying literally to Louisiana law. We agree with appellant that the Louisiana Civil Law prohibits the imposition of a constructive trust or equitable lien on property.[2]

We stated that a "growing minority" of jurisdictions recognize the existence of a fiduciary relationship inuring from the officers or directors or majority stockholders to the individual or minority stockholders, particularly concerning the purchase of stock from a shareholder.[3] The next question presented is which law should determine this relationship—that of Delaware or Louisiana?

■■ It is well settled that a federal court in a diversity case must apply the conflict-of-laws rule of the state in which it sits.[4] While Louisiana conflict-of-laws is silent on which law determines whether such a fiduciary relationship exists in a foreign corporation, its various conflict-of-laws rules are generally the same as in other states.[5] Therefore, we must look to the general law.

2. E.g., Succession of Onorato, 1951, 219 La. 1, 51 So.2d 804, 810, 24 A.L.R.2d 656.

3. Fletcher, Cyclopedia Corporations, perm.ed., §§ 1168–1171. It is noted that "there has been a growing tendency to break down the harsh majority rule that the purchasing director (or officer) owes no affirmative fiduciary duty to disclose to the shareholders by finding exceptions in special circumstances giving rise to a duty to make disclosure, where otherwise there would be a great and unfair inequality of bargaining position by the use of inside information * * *. The opinion has been expressed that this special circumstances doctrine seems likely to supersede both of the older views." Ballantine, Law of Corporations (Rev. ed.), pp. 213–216, as quoted in Fletcher, op.cit. supra, § 1174. This special circumstances or facts doctrine, as crystal-

lized in the landmark case of Strong v. Repide, 1909, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853, has been followed by many jurisdictions. Fletcher, op.cit., supra, § 1171.

The "special facts" and the minority view are also found in Rule X-10B-5 of the Securities Exchange Commission to supplement Section 10(b) of the Act (15 U.S.C.A. § 78j).

4. Klaxon Co. v. Stentor Elec. Mfg. Co., 1941, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477; Palmer v. Chamberlin, 5 Cir., 1951, 191 F.2d 532, 536, 27 A.L.R. 2d 416.

5. For instance, the law governing the right of action in tort is the *lex loci delicti* (Matney v. Blue Ribbon, 1943, 202 La. 505, 12 So.2d 253, affirming La. App., 12 So.2d 249; Mock v. Maryland Casualty Co., La.App., 1942, 6 So.2d 199),

A number of cases have held that the conflict-of-laws rules of the forum require that court to refer to the "law of the State of incorporation to determine the extent and nature of relationship between corporation and stockholder, corporate officer or director and stockholder and between stockholders inter sese,"[6]

while the law of the place of the wrong determines the quantum of the breach of duty.[7] Apparently, Delaware imposes no fiduciary duty on the part of officers or directors or majority stockholders in buying stock from the minority or individual stockholders.[8] In strict logic, a strong case is made that, if this Court's

the law governing the performance of contracts is the place of performance (Vidal v. Thompson, 1822, 11 Mart., O.S., 23; Palmer v. Chamberlin, supra), and the law of the forum governs matters of procedure (Macomber v. De Bardeleben Coal Co., La.App., 1941, 4 So.2d 483, vacating 200 La. 633, 8 So.2d 624.

6. Zahn v. Transamerica Corporation, 3 Cir., 1947, 162 F.2d 36, 40, 172 A.L.R. 495. See also, Rogers v. Guaranty Trust Co., 1933, 288 U.S. 123, 130, 53 S.Ct. 295, 77 L.Ed. 512; Perlman v. Feldmann, 2 Cir., 1955, 219 F.2d 173, 175, 50 A.L.R. 2d 1134; Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corp., 1951, 89 U.S.App.D.C. 171, 193 F.2d 666, 668; Maxwell v. Enterprise Wall Paper Mfg. Co., 3 Cir., 1942, 131 F.2d 400, 402; Geller v. Transamerica Corp., D.C.Del.1943, 53 F.Supp. 625, 629–630; affirmed 151 F.2d 534; Hirshhorn v. Mine Safety Appliances Co., D.C. W.D.Pa.1952, 106 F.Supp. 594, 600; affirmed 203 F.2d 279; Fayes, Inc. v. Kline, D.C.S.D.N.Y.1955, 136 F.Supp. 871, 872.

However, in Blazer v. Black, 10 Cir., 1952, 196 F.2d 139, the court applied Kansas law to determine the fiduciary nature of the parties of an Illinois corporation where all the operative facts occurred in Kansas.

7. Zahn v. Transamerica Corporation, Geller v. Transamerica Corp., and Hirshhorn v. Mine Safety Appliances Co., supra.

8. Cahall v. Lofland, 1921, 12 Del.Ch. 299, 114 A. 224, 228. This case contained the following quote from Du Pont v. Du Pont, D.C., 242 F. 98, 136:

"The duties of a director or other officer of a corporation in transactions where he is representing his company are governed by well-established and familiar rules of equity. A director of a corporation may freely purchase its stock, and occupies no relation of trust to an individual stockholder which prohibits his using whatever advantage his position may afford him through knowledge of its business and condition superior to that of the stockholder with whom he deals. He is not accountable to the

stockholder for withholding information from him which affects the value of the stock, but to the corporation, the whole body of stockholders, he stands in a fiduciary relation which requires him to exercise the utmost good faith in managing the business affairs of the company with a view to promote, not his own interests, but the common interests, and he cannot directly or indirectly derive any personal benefit or advantage by reason of his position distinct from the coshareholders * * *" (114 A. 224, 228.)

Cahall v. Lofland, supra, actually involved the fiduciary duty of directors to the corporation and was affirmed on that premise at 13 Del.Ch. 384, 118 A. 1.

Another Delaware authority is the case of Allied Chemical & Dye Corporation v. Steel & Tube Co., 1923, 14 Del.Ch. 1, 120 A. 486, 491. This case involved the sale of assets and franchises of the corporation under the auspices of 29 Del. Laws, c. 113, § 64A, and the validity of the sale was challenged by the minority shareholders. The Chancellor stated: "* * * An examination of the cases to which special attention is directed by the complainants in this connection will disclose that the personal advantage accruing to the majority is in some way derived from, or intimately associated with, the corporate assets themselves." 120 A. 491.

See, also, Brophy v. Cities Service Co., 31 Del.Ch. 241, 70 A.2d 5, in which an employee of a corporation, acquiring knowledge in the course of his employment that the corporation secretly intended to purchase large blocks of its capital stock in the market, cannot use such information for his personal gain.

Delaware also places a high fiduciary duty upon interlocking directorates regarding transactions between the corporations. Keenan v. Eshleman, 1938, 23 Del.Ch. 234, 2 A.2d 904, 120 A.L.R. 227.

However, Cahall v. Lofland, supra, has been followed uniformly by federal courts in interpreting the Delaware law on this subject. See Zahn v. Transamerica Corp., supra, 162 F.2d 36, 40, and cases there cited; Mayflower Hotel Stockholders Protective Committee v. Mayflower

opinion is based exclusively on the breach of fiduciary obligations owed by directors and majority stockholders of a foreign corporation to minority stockholders, and if literal compliance is given to those decisions holding that the State of incorporation sets the standards for all personal relationships between persons connected with the corporation, the opinion is faulty.

Those decisions (listed in footnote 6, supra) are, however, in our opinion, either inapplicable or unsound where the only contact point with the incorporating state is the naked fact of incorporation, and where all other contact points, such as, residence of parties and actors, situs of property, lex loci delicti or contractus, place where corporation is conducting its only or principal place of business, et cetera, are found in another jurisdiction. Certainly, in such a situation the charter of the corporation and even non-repugnant statutory laws of the state of incorporation limiting corporate powers should govern the internal affairs of the corporation.[9] When, however, the situation is such as here, where neither the charter nor the statutory laws of the incorporating state are applicable, and *all* contact points are in the forum, we believe that the laws of the forum should govern.[10]

This was precisely the situation in Blazer v. Black, supra, note 6, 196 F.2d 139, involving a suit by a former stockholder of a dissolved corporation against its former president for damages for the alleged fraudulent conversion of the

stockholders' stock before dissolution. The corporation was organized under the laws of Illinois but all other contacts were in Kansas. The court reversed the lower court's judgment for defendant, holding that, under the minority view of Kansas, the director was a fiduciary when negotiating with a stockholder for purchases of shares. The court did not discuss the law of Illinois.

In the case of Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corp., supra, note 6, 193 F.2d 666, the District of Columbia Circuit had held in a prior appeal (84 U.S. App.D.C. 275, 173 F.2d 416) that the directors or majority stockholders occupy a fiduciary relation toward the minority stockholders when selling stock control, relying on Supreme Court decisions which arose under federal statutes or which were diversity cases prior to Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188. On the second appeal, after the defendants presented the question that Delaware law should control such fiduciary relations, the court declined to consider whether the "law of the case" applied to second appeal matters determined on a first appeal (193 F.2d at page 669) and held, as a concurrent ground for imposing these high standards, that the District of Columbia and Delaware law is in substantial accord in imposing a fiduciary relationship on a majority stockholder regarding transactions between corporations with interlocking directorates. 193 F.2d at page 671.

Hotel Corp., supra, 193 F.2d 666, 668, 669, 671.

9. 17 Fletcher, Cyclopedia Corporation §§ 8318, 8326. For visitatorial powers of a state over foreign corporations, see Sections 8425–8445.

10. Shares of stock are much like other chattels. Apparently, when the action attacks a transfer of a chattel on the ground of fraud, the law of the state where the chattel is at the time of transfer determines the substantial validity of the transfer. Restatement, Conflict of Laws, § 257 and Comment a, provide: "Whether a conveyance of a chattel which is in due form and is made by a

party who has capacity to convey it is in other respects valid, is determined by the law of the state where the chattel is at the time of the conveyance.

"*Comment:*

"*a. Illegality and fraud.* The validity of a conveyance of an interest in a chattel alleged to be void between the parties for such reasons as illegality of the transfer or illegality of the consideration or other reasons, or alleged to be voidable between the parties for fraud or other cause which affects its substantial validity, is determined by the law of the state where the chattel is at the time of conveyance."

Most of the other cases listed in footnote 6, supra, involve situations where the courts were seeking to impose the fiduciary rule of the state of incorporation in order to escape the inequitable rule of the forum (generally Delaware).

██ However, in view of our holding hereinafter that the district judge was not clearly erroneous in holding that the actions of appellant through its officers constituted actionable fraud under Article 1847, LSA–Civil Code, what has been said concerning the choice of laws to determine the duty owed by officers, directors, or majority stockholders to the minority stockholders may not be necessary for the disposition of this case. That is true because, as will be seen, the broad scope of fraud in Louisiana covers situations where the law imposes an obligation on the party with superior knowledge to disclose facts within his knowledge to the other and to deal in an atmosphere of trust and confidence.

Since appellant's officers had such superior knowledge, Louisiana fraud rules demanded open and disclosed dealings with utmost fairness.

As stated earlier, the equitable remedies of constructive trust or equitable lien are alien to the civil law. Without these remedies and with the rule that "constructive fraud," found in the law of fiduciaries and characterized by the lack of the "intent to defraud," [11] is impossible under Article 1847,[12] Louisiana courts have an awkward time imposing liability for the breach of a fiduciary's duty to disclose or the breach of other fiduciary relations.[13] In some cases involving a relationship of confidence between the parties, the Louisiana courts have used the terms of common-law equity, ordinarily obnoxious to the civil law, to describe the breach and remedy for breach of fiduciary duty, such as, "breach of trust" and "constructive trust." [14] Normally, however, the Loui-

11. The doctrine of "constructive fraud" at common law, being the breach of a legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent, is well discussed in Hornaday v. First National Bank of Birmingham, Inc., 1952, 259 Ala. 26, 65 So.2d 678, 687.

12. In Buxton v. McKendrick, 223 La. 62, 64 So.2d 844, 846, the Louisiana Supreme Court (quoting from Slocomb v. Real Estate Bank of Ark., 2 Rob. 92) said:
 " 'Two things are necessary to constitute fraud: the intention to defraud, and actual loss or damage, or such strong probability of it as will induce a court to interfere.' "
 In Garnier v. Aetna Insurance Co., 181 La. 426, 159 So. 705, 707, the Louisiana Supreme Court said:
 "The defendant (one alleging fraud) therefore carried the burden of proving, not only that plaintiff made misrepresentations, but also that they were knowingly made with fraudulent intent."
 In Poitevent & Favre Lumber Co. v. Standard Planing Mill & Manufacturing Co., 49 La.Ann. 72, 78, 21 So. 194, 196, the Louisiana Supreme Court said:
 "Our predecessors have frequently employed, in this connection, such emphatic language as this, viz.: 'To constitute fraud, there must be an intention of defrauding consilium fraudis, and an actual loss, eventus damni.' "

13. See the difficulties confronting the courts in Succession of Onorato, supra, note 1, 51 So.2d 804, 810, 816, and in Griffing v. Atkins, La.App., 1941, 1 So. 2d 445, as discussed in note 16, infra.

14. For instance, in Watkins v. North American Land & Timber Co., 1902, 107 La. 107, 31 So. 683, 685, the court reversed a lower court judgment for defendants and remanded the case for trial where:
 "The contention of the defendants is that the petition exhibits nothing more than an attempt by a stockholder to control, with the aid of the court, the action of the managing agents of the corporation, representing the majority of the stockholders, and that this cannot be done in the absence of allegations of fraud, ultra vires, breach of trust, or gross negligence or misconduct, none of which, are alleged * * *."
 In Haynesville Oil Co. v. Beach, 1925, 159 La. 615, 105 So. 790, 791, the court held:
 " * * * The fact is, however, that defendant, whilst commissioned to purchase the rig in the name of plaintiff, nevertheless purchased it in his own name, using plaintiff's money for that purpose. This was a breach of trust, and the title which defendant obtained to said rig inured to the benefit of plaintiff, whom

siana courts, in finding liability for a breach of a fiduciary duty, have based such liability on "fraud" as encompassed in Article 1847 of the LSA–Civil Code. This is true in cases involving both corporate fiduciaries [15] and other fiduciar-

he represented. McClendon v. Bradford, 42 La.Ann. 160, 7 So. 78, 8 So. 256.

\* \* \* \* \* \*

"We hold that the drilling rig is the property of plaintiff."

And in Succession of Bienvenu, 1901, 106 La. 595, 31 So. 193, 194, the court stated:

" \* \* \* The company signed its name to the deed really as her agent and representative. In observing the form of selling the property to her, as relates to the land it held and which had been bought with her money in compliance with agreement, it only placed her in possession of her property. The company, from the date of the deed to it, held the property in trust. \* \* \*

" \* \* \* We have seen that the parties to the agreement had created a constructive trust, under which the homestead company held temporarily for the real owner. Improvements placed on property held in trust with the consent of the owner must be accounted for when the property is delivered to the owner. \* \* \*"

And in McClendon v. Bradford, 1890, 42 La.Ann. 160, 7 So. 78, 79, where an agent acquired an interest adverse to his principal, the court stated:

" \* \* \* The title they obtained to said Rosanna Harris land claim, and through which they had obtained patent, issued to them as the owners of the same, must inure to the benefit of the parties whom they represented. It was a constructive trust, which they held for the benefit of their principal. \* \* \*"

To the same effect, see Assunto v. Coleman, 1925, 158 La. 537, 104 So. 318, 319.

See also, Jansen v. Bellamore, 1920, 147 La. 900, 86 So. 324, 327–329.

15. In Markey v. Hibernia Homestead Ass'n, La.App., 1939, 186 So. 757, 758, 764, a case relied on by this Court in its prior opinion, the plaintiff sued "to recover the damages she claims to have sustained as the result of a scheme allegedly concocted by the defendants by which she charges that she was fraudulently induced to sell to the homestead 17 shares of its capital stock (par value $100 per share) for $50 per share." After fully discussing the fiduciary duty owed by defendant directors to the plaintiff, the court stated:

"It is to be observed here that the defendant directors were not purchasing plaintiff's stock with their own funds. On the contrary, they were using the assets of the corporation for that purpose. It seems too plain for extended argument that, under such circumstances, they became trustees for all of the stockholders and that, if they concealed in bad faith any facts from any one of the persons affected by the plan they devised, they should be made to respond for their deceit."

And the court concluded:

"A careful analysis of plaintiff's petition and the exhibits attached thereto justifies the conclusion that she states a case of actionable fraud."

The case was reversed for trial and after judgment for defendants, plaintiff prosecuted her second appeal. The court in Markey v. Hibernia Homestead Ass'n, La.App., 1943, 13 So.2d 791, 795, states:

" \* \* \* In other words, the complaint is that the defendants fraudulently devised a scheme to unjustly enrich themselves at plaintiff's expense. It was because of these charges that we, in our first opinion (see La.App. 186 So. 757), reversed the judgment of the court below and sustained plaintiff's cause of action. Later, in a similar case (but where no allegations of actionable fraud were set forth), the Supreme Court maintained an exception of no cause of action in a suit by a stockholder of a homestead to have a sale of her stock to the homestead rescinded. See Wessel v. Union Savings & Loan Ass'n, 198 La. 219, 3 So.2d 594.

"The evidence in the case discloses, beyond question, that there is no foundation in fact for plaintiff's charge that the Directors of the homestead conspired to recapture her stock for their own benefit \* \* \*."

While the court had presented the question of whether or not "bad faith" needs to be shown when misrepresentations are made by a defendant in a fiduciary capacity, the court held that no misrepresentations were made, and did not decide this question:

"Counsel for plaintiff contends that, in spite of the fact that the Board of Directors had no intention of enriching themselves at plaintiff's expense, the defendants are, nevertheless, responsible because,—(1) they misrepresented to her the sound, or book value, of her stock \* \* \*. And it is further argued that, in view of the fiduciary relationship existing between the defendants and the stockholders of the homestead, it is immaterial whether the alleged misrepre-

ies [16] Therefore, the breach of the relationship is called fraud and the remedy is, of course, a rescission of the contract or damages.[17] By bringing such rela-

sentations were made by the defendants in bad faith or not.

"The first contention, that the defendants misrepresented the value of the homestead stock, is wholly without merit. The various communications mailed to the shareholders exhibit that the defendants made no representations with respect to the value of the stock * * *." (13 So.2d 791, 796.)

In Pool v. Pool, La.App., 1943, 16 So.2d 132, 133, also cited in the first opinion, the suit was against the directors individually to recover for the individual liability imposed on plaintiff after the liquidation of the corporation, "all of which was caused by the ineptness, lack of skill, malfeasance, neglect, actionable deceit and fraud on the part of the defendants." After setting out the liability of directors to individual stockholders for "wilful neglect of duty, gross negligence on their fraudulent breach of trust" and after holding that the prescription of ten years would apply "for the reason that the relation between the defendants as directors and plaintiff as a stockholder was a fiduciary relationship and their duty to him was a special duty and not one which they owed to the general public," the court reversed the case and allowed plaintiff to amend his petition.

In Commercial Nat. Bank in Shreveport v. Parsons, 5 Cir., 1944, 144 F.2d 231, 238–239, the court stated that "a hard bargain driven by fiduciaries in such circumstances is presumed to be fraudulent and void."

In the case of Wessel v. Union Savings & Loan Ass'n, 1941, 198 La. 219, 3 So.2d 594, 595, 598, 599, not cited in the first opinion, the plaintiff alleged that defendant was guilty of fraud because it induced her to sell her stock at a price which was less than its book value or its value on the open market. The plaintiff alleged that:

" * * * the association and its officers knew or should have known that the stock had a greater value than that which they represented in the circular letter, and that by means of this letter the president and secretary of the association conspired to conceal and did conceal the true value of the shares of stock, and thereby took an unfair advantage of their fiduciary relation and of the trust and confidence which the plaintiff and other shareholders had and were entitled to have in the officers and directors of the association." 3 So.2d 594, 595.

The court, in holding for the defendant homestead association, stated:

"It is declared in the third paragraph of article 1847 of the [LSA–]Civil Code that a false statement made by a party to a contract of sale, as to the value of the object of the sale, is not such a fraud, 'such an artifice', as will give to the other party the right to annul the sale, if the object was of such a nature and in such a situation that he who was induced by the false statement to enter into the contract 'might with ordinary attention have detected the falsehood'. Therefore, if the statement in the circular letter which induced the plaintiff to sell her shares of stock for $50 per share, that the listing of the stock would be reduced to $38 on the nineteenth day after the date of the circular letter, should be regarded as a false statement, it was not a false statement of which the plaintiff may complain, because 'with ordinary attention' she could have learned all that any one else could know about the value of her shares of stock. On account of the fiduciary relation of the officers and directors to the stockholders of a corporation, the third paragraph of article 1847 of the [LSA–] Civil Code might not be deemed applicable to this case if the president and secretary of the Union Homestead Association had withheld from the plaintiff any information concerning the value of her shares; but that is not the case." 3 So.2d 594, 598–599.

16. See cases in note 14, supra.

In Succession of Onorato, 1951, 219 La. 1, 51 So.2d 804, 807, 810, the plaintiffs attempted to recover the net proceeds of life· policies made payable to the deceased's executors for the reason, inter alia, that, while deceased was acting as their agent in maintaining their properties, the premiums paid to maintain these policies in force were paid from rental revenues collected by him in his fiduciary capacity, "and that accordingly a constructive trust or equitable lien has been impressed upon the insurance proceeds in their favor." The court stated this contention as follows:

"We now come to appellants' fourth and last contention, that the premiums paid to maintain these insurance policies in force while deceased was acting as their agent were paid from rental revenues collected by him in his fiduciary capacity

tionship under the broad heading of fraud, the Louisiana courts have, in ef-

fect, reached the same results as would be reached under the common-law—re-

and misappropriated to his own use, and that under these circumstances they are entitled to recover the net proceeds realized from these policies.

\* \* \* \* \* \*

"Appellants base the contention now being considered on fraud, and this fraud is the more reprehensible because committed by the deceased in breach of a fiduciary relationship against those to whom he owed the utmost sincerity and fidelity." 51 So.2d 804, 810.

After holding that the legislature did not intend for the statutory provision exempting the proceeds of life insurance from debt to apply to proceeds received as a result of a fraudulent act, the court allowed recovery.

Justice McCaleb, dissenting in part, stated:

"\* \* \* For my part, I see no difference, insofar as the application of the legal exemption is concerned, between debts which emanate from legitimate causes and those resulting from a breach of trust. Surely, the statute makes no distinction in this regard and it is not our function to write such an exception into the law. Nulsen v. Herndon, 176 La. 1097, 147 So. 359, 88 A.L.R. 236. True enough, a majority of the common law states provide authority for the prevailing opinion but those pronouncements are founded on the constructive trust or equitable lien doctrine, which is unknown in Louisiana; albeit, the antithesis of the provisions of our Code dealing with privileges." 51 So.2d 815–816.

In Griffing v. Atkins, La.App., 1941, 1 So.2d 445, 449, 450, an ignorant Negro intervened in the suit seeking to rescind a sale of a $1250 diamond ring, which he had found, and which was purchased from him by a jeweler for $130.00. The court held:

"The ground on which Sims, the intervenor, seeks to set aside the sale is of course one arising out of the Articles of our [LSA–]Civil Code relating to error and fraud. Under Art. 1819, there are four defects of consent which will invalidate any contract entered into by the parties, viz.: 'Error; Fraud; Violence; Threats.' We are concerned with the first two, but in reality this case involves the second thereof for the reason that Art. 1832 provides that: 'In all cases, however, when the information, which would have destroyed the error, has been withheld by the other party to the contract, it comes under the head of fraud, and invalidates the contract.' The article rela-

tive to the nullity of contracts from fraud is Art. 1847. The preliminary statement of that article is the most important as it defines fraud, as it applies to contracts, as 'the cause of an error bearing on a material part of the contract, *created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other*' (italics scoring ours). From this definition, the article then lays down twelve certain rules which it says are drawn therefrom. In rule 4, we find particular reference to false assertions constituting an artifice regarding objects that require particular skill or habit, or any difficult or inconvenient operation to discover the truth or falsity of the assertion; examples are given therein but they are not exclusive. Rule 5 provides that fraud arises from some false assertions made as to the value or quality of the object forming the subject of the contract or by the suppression of what is true regarding the same. Rule 6 provides that: 'The assertion and suppression, mentioned in the last preceding rule, mean not only an affirmation or negation by words either written or spoken, but any other means calculated to produce a belief of what is false, or an ignorance or disbelief of what is true.' These rules contemplate that in a contract of sale of the very nature of the one with which we are now concerned that where the parties are on an unequal footing, and not dealing at arms length, the one possessing the superior knowledge regarding the value or the quality of the object is held to the exercise of the greatest care and caution in conducting himself and must not take undue advantage of the other party, who, as it happens in this case, is one totally ignorant of the value or quality of the object and who was attempting to obtain information relative thereto.

"In this case, Sims went to Roumain's store upon the solicitation of one of the employees where he had the right to expect a full and complete disclosure of the facts and of the truth regarding the ring. He did not know Roumain, Collins or Griffing. He went there for technical advice as to the character and value of the ring. All of these, in our opinion, were in a fiduciary or quasi-fiduciary relationship towards him, and Sims had a right to expect, in fair dealing, the true information which he had been invited to seek there; and no one, especially under

sults which seem to common-law lawyers hard to obtain under a literal interpretation of the Civil Code.[18]

It is also apparent that these same results are achieved when the Louisiana courts hold:

> "In determining whether or not fraud has been proved, the situation of the parties and the circumstances surrounding the transaction may be taken into consideration," Winzey v. Louisiana Industrial Life Ins. Co., La.Ct.App., 1940, 195 So. 67, 69;

and when they hold:

> "Considerable stress is laid by counsel for plaintiff on the question of the proof that is generally required to show that fraud exists. Whilst it is true that in Article 1848 of the [LSA-]Civil Code it is provided that fraud, like every other allegation, must be proved by him who alleges it, however, that same article further provides that 'it may be proved by simple presumptions, or by legal presumptions as well as by other evidence. The maxim that fraud is not to be presumed, means no more than that it is not to be imputed without legal evidence.' Courts have always acknowledged how difficult it is for one to prove fraud by positive and direct testimony, realizing full well that those who indulge in it generally prepare themselves in such a manner as to cover up and leave no traces of their practice behind them. In an early case, Simon-Gregory Dry Goods Co. v. Newman, 50 La.Ann. 338, 23 So. 329, the Court stated that: 'While fraud is never to be presumed, courts of justice "recognize the cun-

ning concealment in which it shrouds its devious practices and the difficulty of tracing it by direct proof."' We can well conceive of such a situation in this case where such practices may well have been indulged in and it becomes next to impossible to put our finger on any particular piece of direct testimony to show actual fraud on the part of Griffing. As a matter of fact his fraud wasn't active but rather of a passive nature in that he failed to disclose the information which he was in justice and in equity bound to disclose to the other party to the contract who was not on an equal footing with him. He suppressed the truth, and therefore the case comes within the rules laid down in our Civil Code," Griffing v. Atkins, supra, 1 So.2d 445, 450;

and when they hold:

> " * * * 'Fraud,' as the word is used in our Code and in courts of equity, as relates to contracts, 'comprises all acts, omissions and concealments involving a breach of legal or equitable duty and resulting in damage to another'," Thieme v. Collier, 1930, 13 La.App. 661, 128 So. 730, 731;

and when they hold:

> " * * * While a purchaser is under no obligation to inform a prospective vendor as to the value, the title or the condition of the property involved, he, individually, or as agent for his principal, having made representations and statements as to the value, the title or the condition of the property, knowing them to be false or reckless or without

---

the circumstances as we view them, where all of them had the knowledge of the ring's true character and value, should have taken advantage of him and attempted to buy the ring at a price which was so much out of proportion to its true value."

**17.** The remedy given by the district court as affirmed by this Court is a rescission of the sales of plaintiffs' stock to defend-

ant, a recognition of the plaintiffs as the owners of said stock, and an order for accounting following judgment for plaintiffs "against defendant for their pro rata portion of the assets of defendant distributed in liquidation, said portions to be credited with the amount each plaintiff received for his stock."

**18.** See the cases in notes 14, 15 and 16, supra.

knowledge of their truth or falsity, is under the solemn obligation to make correct representations and tell the whole truth, without concealment or suppression of any material facts, especially if there exists an inequality of knowledge, as where the seller does not reside near the land and the purchaser does and is familiar with it," American Guaranty Co. v. Sunset Realty & Planting Co., 1945, 208 La. 772, 23 So.2d 409, 449;

and when they hold:

" 'Two things are necessary to constitute fraud: the intention to defraud, and actual loss or damage, or such strong probability of it as will induce a court to interfere.' (Slocomb v. Real Estate Bank of Ark., 2 Rob. 92)," Buxton v. McKendrick, 1953, 223 La. 62, 64 So.2d 844, 846;

and when they hold:

"The rule of equity, briefly stated, is that a purchase by a trustee or agent per interpositam personam carries fraud on its face. Michoud's Case, [Michoud v. Girod] 45 U.S. (4 How.) [503] 552, 11 L.Ed. 1076." Cuggy v. Zeller, 1913, 132 La. 222, 61 So. 209, 212.

We have not overlooked the matters pretermitted on pages 753 and 754 of 263 F.2d, but we think that those matters have been sufficiently covered in the opinions of the district court and of this Court and that the contentions there pretermitted are without merit.

▮ In our original opinion we wrote too much in the language of the traditional equity jurisprudence familiar to lawyers in common-law states. The evidence viewed in the light of the civil law, including the principles just discussed, removes the doubt which we held "that the 'intent' element necessary as the basis for actual fraud was adequately established." In view of the confidential relationship existing between the parties, and considering the circumstances surrounding the transactions, we now hold

that the district court was not clearly erroneous in holding that the necessary "intent" had been established to constitute actionable fraud in Louisiana. The petition for rehearing is therefore,

Denied.